**PHILLIPS PETROLEUM CO. et al.**
**v. HARDEE et al.**
No. 13370.

United States Court of Appeals
Fifth Circuit.
May 22, 1951.

John A. Hickman, Thos. F. Porter, Lake Charles, La., Charles F. Bailey, Lafayette, La., Ben C. Dawkins, Jr., Shreveport, La., for appellants.

Stuart S. Kay, DeRidder, La., for appellees.

Before HUTCHESON, Chief Judge, and HOLMES and BORAH, Circuit Judges.

HUTCHESON, Chief Judge.

The suit, brought by rice farmers against four oil companies operating producing wells and one pipe line company in the vicinity of plaintiffs' lands, was for damages to plaintiffs' crops and land resulting from the pollution and contamination of the waters of Hickory Creek which were used by them for irrigation.

The claim in general was: that in July, 1948, Hickory Creek, which is normally

a fresh water creek fed by springs and periodical rains, received into it a discharge of salt water and other contaminating and injurious substances; that these defendants were responsible for the contamination in that they did, during the months of June and July, 1948, and for several months preceding, discharge, and permit to escape, into the drains, ditches, gullies, branches, and other tributaries which drained their respective areas of operation, large quantities of chemicals, mud, acid, oil, and salt water, which substances were discharged and permitted to drain into Hickory Creek and cause its contamination and pollution; and that plaintiffs, in complete ignorance of the contamination of Hickory Creek, pumped the polluted water upon their crops of young rice, with the result, the injury and damage sued for.

Each defendant filed a separate answer, denying generally and specifically the charges of contamination and pollution and its liability or responsibility therefor.

After the jury was impaneled, and before the introduction of evidence had begun, the court, no one objecting to it, but plaintiff stating, and the judge agreeing, that the matter was still to be argued out, stated to the jury that the suit was not one charging concerted action or conspiracy on the part of the defendants, and, therefore, seeking a solidary judgment; it was one against each of the five companies separately and apart;[1] and, thereupon, the cause proceeded to trial and was tried on that theory.

■ A great deal of evidence was offered upon the issues of, the cause and the extent of the damages claimed.[2]

1. " * * * From the pleadings in this case, from the language of the plaintiffs, there is no charge made that these companies connived, understood one with the other that they were going to put out stuff in any of these channels whatever. In the absence of that, the opinion of the Court up to now is that unless facts will be disclosed later it will be that this is a case by these plaintiffs against each one of these five companies separately and apart. The judgment will not be one solidary in character. In other words, if it is a fault of any one of these defendants it is not the fault of the other defendants. It is only the fault of that one, if there be any. So, during the course of this case the injunction of the Judge is that you carefully keep up with the evidence and assess to each of these companies whatever be their misgivings or shortcomings. I don't say there are any but do not assess the fault of one as being the fault of all because there is no charge and no allegation and apparently there will be no proof of any concerted action or conspiracy of the five defendant companies to do injury to these plaintiffs. If there be any injury, it will be through the act of one or several but you want to separate the evidence and keep in mind each of the five defendants, whether it be any fault and that the fault of one is not the fault of all is the principal thing I want to bring to your attention and the judgment will not be one solidary judgment against all.
   "If you give any judgment at all you will have to bear in mind you may have to assess it in part or in whole to some or to all or to none. All right, that is about it."

2. Without setting any of it out in detail, it will be sufficient to say of it that there was evidence sufficient to support the verdict that there was injury to the rice crops through water contaminated by salt; that this contamination occurred some time after the middle of July when the pumps started up again, and, as one witness said, "We pumped on until the last of July, when the boys that were working in the field found out the water was salty and contaminated"; that after this was found out, plaintiffs commenced inquiries and investigations to locate sources of the trouble; that after the salt was discovered, the water was cut off from the rice and drained off as well as could be done; that the rice came to a head but with less than the average yield; that 1948 was a very dry year; that the fields had been flooded in June by pumping from June 1 to June 15, and that at that time the water was all right; that they started again in the first part of July, the water then being good, and pumped every day until they got the bad water; that after they stopped pumping for a week or so the water cleared up and they flushed the salt water off the land as well as they could, and continued using the water all through August and September, and the water was good.
   Thus the evidence indisputably fixes the contamination in the creek water as

Plaintiff offered no direct evidence showing that waste or contamination was discharged into Hickory Creek or its tributaries in the critical period in July, or, indeed from the time the pumping began in June.

The evidence, completely circumstantial throughout, consisted: of testimony that the salt water disposal systems were not always escape proof; of testimony of escapes or discharges from the salt water wells or systems, at times too remote from the critical period for the particular water, testified to as escaping, to have caused the damage; and generally of testimony as to drainage conditions in the oil fields, including testimony that salt crystals had been seen in dry gullies near the disposal systems and in drains in and leading to the oil fields; of testimony that the only source from which the contamination could have come was the oil fields; that at times other than in June and July, salt water had been seen escaping or being discharged from the disposal systems of one company or another, so that a reasonable inference from the facts was that the salt water causing the contamination must have escaped at some time or other from some of the properties or disposal systems of the defendants.

After motions for directed verdict filed by plaintiffs and by each defendant had been denied and full arguments had, and plaintiffs and defendants had submitted special requests,[3] the case was submitted

within the last two weeks of July and as indisputably establishes that for the balance of the season the water was clear.

Hickory Creek, fed by springs as well as by rains, runs all the year around. In dry weather, however, it does not have too much water in it throughout, being deeper in some, and shallower in other, places.

3. Among those submitted by plaintiffs were the following:

"3. If it is found that two or more of the defendant companies discharged salt water, oil, or other noxious substances into and thereby contributed to the pollution of Coles creek and Hickory creek, and that such pollution caused injury to the plaintiffs then your verdict in such cases must be against all defendants who contributed to the pollution for the damages sustained by the plaintiffs without an apportionment among them. Williams v. Pelican Natl. Gas Co., 187 La. 462, 175 So. 28; Eagen v. Tri-State Oil Co., La.App., 183 So. 124."

"4. In the alternative and in the event the Court should refuse special instruction No. 2, above, then plaintiffs request that the Court instruct the jury as follows:

" 'If you find that salt water, oil, and other noxious substances were produced by the defendants, or any of them, through operations and instrumentalities under their exclusive control, and that such substances were allowed to escape and drain into the creeks and drains in question, and that damage resulted therefrom to plaintiff's rice crops, then I instruct you that the burden in such event is upon the defendants to prove that they were not at fault in discharging or allowing the escape of such substances into the creeks and tributaries under the doctrine of *res ipsa loquitur.*' "

Among those submitted by defendants were the following:

"2. I further charge you that there is no joint or solidary liability, if any, on the part of the defendants, and that no act of one defendant shall be given consideration in determining the liability of any other defendant, each defendant being liable, if at all, only for loss occasioned separately by his own acts."

"3. I further charge you that a verdict cannot be rendered against any defendant for loss of rice unless the plaintiffs have proved by the weight of the evidence that such defendant, without regard to any act of any of the other defendants, or any other defendant, did discharge salt water into Hickory Creek or any of its tributaries, and that the salt water so discharged by that defendant reached the lands of plaintiffs in sufficient quantities to result in, and which did result in, the damage to the rice claimed by plaintiffs in this suit."

"4. I further charge you that no verdict shall be given against any defendant unless the weight of the evidence shows that that particular defendant did, itself, alone discharge sufficient amounts of salt water, which reached the crops of plaintiffs and caused their loss, independently of any other factors or actions of any other defendant."

"7. I further charge you that if you find that the plaintiffs, or some of them, have been damaged by one or more of the defendants, but also find that the evidence fails to establish with legal cer-

to the jury on a general charge which, modifying plaintiffs' requested charge No. 3, note 3, supra, by inserting "the one knowing the other was doing it and vice versa", and refusing plaintiffs' requested charge No. 4, note 3, supra, modifying defendants' requested charge No. 2, note 3, supra, by inserting in it, "if they did not know of each other's doings", gave defendants' requested charges, Nos. 3, 4, and 7, note 3, supra, and in addition gave a charge [4] of the court's own, submitting a theory of the defendants conniving and working together, in which event they would be solidarily liable, and it told the jury that, in this event, each defendant would be liable to pay the plaintiffs directly its fractional share of the total.

The jury was instructed that it could find for either plaintiffs or defendants, and for its use in connection with its verdict, if it was for plaintiffs, the jury was provided with several forms of verdicts to choose from.[5]

Thereupon, after the parties had stated their objections to the charge, including on plaintiffs' part an objection to the various forms of verdict, the jury retired and, after deliberation, returned into court a verdict as to each Phillips, Shell and General Crude, in form as follows:

"We, the jury, find that the negligence of ............ by itself was sufficient to cause the injury to the plaintiff in the amount set forth. $16,078.243"
and as to Barnsdall Oil Co., in the same form with, however the sum of $3630.571.

None of the other form verdicts were used, except form "j", and this was filled in with a finding as to the damage to each plaintiff.

tainty which defendant was responsible for the damage, you cannot, in such case, render a verdict for the plaintiff or plaintiffs."

4. "Gentlemen of the jury, if you should find by the preponderance of the evidence and to a legal certainty that any two or more of these defendants worked together and to each other's knowledge connived by their mutual neglect, irrespective of the ratio of negligence in causing the injury to a plaintiff or to the several plaintiffs, you are to find against these defendants solidarily. The defendants would then be called joint tort-feasors but with knowledge that the other or others were emptying salt water into the creek at issue.

"This means that any one of the defendants that you have cast is liable for the whole amount to the plaintiff or plaintiffs; however, when this defendant has paid plaintiff or plaintiffs this whole amount he has the right of contribution due him for the share he paid for the other or others.

"In practice, Gentlemen of the Jury, what occurs in a case like that is that each defendant held solidarily liable pays the plaintiffs directly his fractional share of the total."

5. One of these was a set of five forms, reading:
"We, the jury, find that the negligence of ............ by itself was sufficient to cause the injury to the plaintiffs in the amounts set forth" (each form being

filled in with the name of a different defendant).
Another form was:
"We, the jury, find that the following defendant, or defendants, ............, though neglectful, was, or were, not singly or alone the cause of the injury to the plaintiffs Therefore, the case is against the plaintiffs and for these defendants."
Another one was:
"We, the jury, find that ............ is not, or are not, liable because not negligent at all, or if negligent, not sufficiently so to have been the one proximate cause of the injury."
Another one was:
"We, the jury, find that the following defendants, ............, worked together, and to each other's knowledge, connived by their mutual neglect, irrespective of the ratio of negligence, in causing the injury to the plaintiffs; that they were joint tort-feasors with knowledge in each that the other or others were emptying salt water into the creek; and, therefore, we find against these defendants solidarily and for the plaintiffs."
and finally, form "j":
"If you find for the plaintiffs and against one or more of the defendants, we, the jury, find for ............ in the sum of $............ (filling the blanks in each case with the name of the plaintiff and of the amount found for him)."

Upon receipt of the verdict, the court advised the jury that the verdict would not be received because it did not respond to the charge, in that, as to Barnsdall Oil, it did not find it responsible by itself for the whole damage, nor did it find that there was any concert of action; and that they must either find Barnsdall responsible for the whole damage or not responsible at all.

The jury was further advised that since it had found in its verdict as to the amounts each plaintiff should recover, the special verdicts against each company should not name any particular amount because the amounts found for the plaintiffs would be equally divided among those found responsible.

Advised on their request, whether it was possible to find one company less negligent and liable for damages than the others, that it was not so possible, and then advised that "you can hold each one liable by itself if you think it was sufficiently negligent to cause it all", and "as you increase the number it divides the burden of the companies", and "if you reduce it to two companies, each of the two companies would pay half of the total amount", the jury was then furnished with a new set of form verdicts and sent back.

Shortly thereafter the jury returned with their new set of verdicts. These, finding the same amount for each plaintiff as before, found Phillips, Shell and General Crude each by itself guilty of negligence sufficient to cause the injury to the plaintiffs, and Barnsdall Pipe Line and Barnsdall Oil not liable.

Each of the defendants, appealing from the judgment, is here insisting, as its main point: that the evidence was insufficient to support the verdict; and, in addition: (1) that the plaintiffs did not have the legal right, during the year 1948, to irrigate their rice crops, nor did this defendant have any legal duty toward plaintiffs to maintain the water of the creek for rice irrigation or other purposes; and (2) that the court erred in charging the jury that defendants could be found solidarily liable as joint tort-feasors, even though they

acted separately, if they knew of each other's doings in the field.

■ Disposing first of the last two points, it is sufficient to say of them that point No. 1, as to the legal right of plaintiffs, was not taken sufficiently below to permit of its being urged here for the first time, no special charge was requested on it, and the only statement of it as one of the grounds for the instructed verdict did not make the point which is sought to be made here, that the plaintiffs were no riparian owners. We, therefore, pass the point without determining it.

As to point No. 2, it is sufficient now to say, as will be shown further on in the opinion, that the error in this charge was not against defendants but against plaintiffs.

On their main point, the insufficiency of the evidence, each appellant insists that the evidence does not point with sufficient compelling force to it as the sufficient cause for the whole damages sued for, and does not, therefore, measure up to the degree of certainty required in Louisiana in a circumstantial evidence case. Iterating and re-iterating this point, each appellant insists that, assuming that the proof is sufficient to establish that the pollution came from the oil fields, it is not of such nature to support the finding on which the judgment rests that each of the defendants cast was by itself responsible for the whole damage and, the proof failing to do this, the judgment may not stand.

Pointing to the fact that Barnsdall had fourteen wells in the Longdale field where it operated, and that Crude, Phillips, and Shell together had only three or four in the Bear Creek field, they insist that it is impossible from this evidence to say more than by guess what part of the contamination came from one or the other of the defendants.

Phillips, on its part, insists that there is no evidence of negligence on its part, none as to any waste by flowage or leakage, as to it, except the one instance, in January, 1949, six months after the occurrence, and that the evidence was wholly insufficient to support the verdict as to it.

Shell and General Crude, in their turn, point out: that the evidence, as to them, while sufficient to support a finding that some salt water escaped from their disposal wells in March, the proof establishes, and it is admitted by all, that this waste did not cause the damage; that the creek was clean and clear in June; and that there is no proof of any negligent act or thing done by either of them at or near the time complained of.

Finally, each appellant, conceding for the argument that the evidence supports the conclusion that the pollution and damage was caused by salt water coming either from an untestified to escape or flowage, or from the effects of rain water falling on and flowing over the salt encrusted beds of the gullies on defendants' properties, insists that the basis for a verdict that the negligence of each by itself was sufficient to cause the whole damage is completely non-existent.

We agree with the appellants that this is so. Search the record as carefully and exactly as one may, there is no logical or legal basis to be found in it for the findings on which the judgment rests.

The real source, though, the real reason for the verdict in the form it took, is not far to seek, nor hard to find. It is to be found in the limiting directions of the charge which in substance advised the jury that in order to effectively find for the plaintiffs against any of the defendants, the verdict must be in substantially the form chosen by it and in the further instructions that the more defendants who were found liable, the less the burden on each would be.

The evidence furnishing, as it did, a sound basis for the view that the pollution had come from the oil fields,[6] indeed furnishing little or no reasonable explanation for it otherwise, the jury naturally followed the lines of least resistance and, finding each defendant liable, they divided the burden among as many defendants as, under the court's instructions, they were permitted to find liable.

Barnsdall, first bound by them for a smaller amount than the others were bound, was later loosed under the impact of the judge's instructions that they must do so unless they were willing to find it responsible for more damage than they thought it had caused.

The jury, in short, as shown by the verdict first returned, reached the conclusion that all of the oil companies were jointly responsible for the damage, each of three of them for the same amount of it, one of them for a lesser amount.

Unable, under the limiting provisions of the charge as to solidary liability, that there should be some kind of concert in order to find the defendants solidarily liable, the jury, in the verdict, in order to achieve the result desired, employed the formula verdicts tendered to it, over plaintiffs' objections, and found each of the three defendants by itself responsible for the whole damage.

It is quite plain that this verdict is without support in the evidence and that the judgment based on it may not stand.

This does not mean, however, that a verdict should have been directed for each defendant. On the contrary, we think there is evidence, if no more than the evidence of the salt encrusted beds of drains and gullies, from which it could be found: that the defendants, though acting independently and not in concert, were jointly and severally responsible for the pollution and liable for the damage caused; that the case was wrongfully submitted to the jury in that instead of submitting it on defendant's theory of no liability as to any defendant, unless its negligence separately considered caused the whole damage, it should have been submitted upon the theory embodied in plaintiffs' requested charge No. 3, note 3, supra.

Louisiana, in common with many other jurisdictions, gives full support to the rule that where persons acting independently are guilty of negligence, and the results of their negligence combine to set up a chain of causation resulting in

6. White v. Edgerly Petroleum Co., 4 La.App. 20.

the complained of damage, these persons, though not acting in concert, are yet joint tort-feasors and, as such, are liable for the damage caused by the conjunction of their separate negligence, just as in collision cases, persons acting separately and independently are none the less liable for the whole damage caused where their negligence concurs to produce the result.

It is true that "it has been stated as a general rule that where several persons act separately and independently, and not in concert, one is not liable for all the damage suffered by another by their separate torts; in such case there is no joint liability for the damage, but each is liable only for the damage done by his own act. Separate and distinct tortious acts resulting in separate and distinct injuries, even to the same subject matter, do not create joint liability on the part of the tort-feasors." 52 Am.Jur., "Torts," Sec. 112, pp. 452–455, (and see cases cited in notes 2 and 3 thereunder).

There is, however, "much authority in favor of the principle that joint, or more precisely, joint and several, liability may exist notwithstanding the absence of concerted action on the part of wrongdoers. Thus, where the independent tortious acts of two or more persons supplement one another and concur in contributing to and producing a single indivisible injury, such persons have in legal contemplation been regarded as joint-feasors, notwithstanding the absence of concerted action. This rule has been regarded as applicable where the acts are concurrent as to place and time and unite in setting in operation a single destructive and dangerous force which produces the injury." 52 Am.Jur., "Torts," Sec. 112, p. 451–2, (and see cases cited in notes 15, 16, and 17 thereunder).

In American Law Institute, Restatement, Torts, Vol. 4, Sec. 879, it is declared that with an exception relating to persons contributing to a nuisance, each of two persons who is independently guilty of tortious conduct which is a substantial factor in causing a harm to another is liable for the entire harm, in the absence of a superseding cause.

The principle applicable here is perhaps best stated in 38 Am.Jur., "Negligence", Sec. 257, p. 946. There, after stating in substance that notwithstanding the absence of any concert of action or unity of purpose, where the acts of several persons are concurrent as to place and time, and unite in setting in operation a single destructive and dangerous force which produces the injury, the text goes on to say, citing many authorities, "According to the great weight of authority where the concurrent or successive acts or omissions of two or more persons, although acting independently of each other, are in combination, the direct or proximate cause of a single injury to a third person, and it is impossible to determine in what proportion each contributed to the injury, either is responsible for the whole injury, even though his act alone might not have caused the entire injury, or the same damage might have resulted from the act of the other tort-feasor * * *. As the rule is sometimes stated, where each of two or more persons owes to another a separate duty, which each wrongfully neglects to perform, they may be held jointly liable, although the duties were diverse and disconnected, and the neglect of each was without concert, if such several neglects concurred and united together in causing the injury."

Louisiana follows this rule.[7] If, therefore, on a new trial, plaintiffs can adduce evidence sufficient to show that the defendants, or any of them, were negligent and, though acting separately, their negligence combined to produce the pollution damage, plaintiffs may recover for the whole damage against one or all of those contributing. The judgment is reversed and the cause is remanded for further and not inconsistent proceedings.

7. White v. Edgerly Petroleum Co., 4 La. App. 20; McFarlain v. Jennings-Haywood Oil. Syn., 118 La. 537, 538, 43 So. 155; Williams v. Pelican Natl. Gas Co., 187 La. 462, 175 So. 28; Eagan v. Tri-States Oil Co., La.App., 183 So. 124; Greer v. Pelican Natl. Gas Co., La.App., 163 So. 431; Bilbray v. Pelican Natl. Gas Co., La.App., 163 So. 433; see also 17 Tulane Law Review, 667.